**Calvin BURKS et al., Plaintiffs,**

v.

**Joseph TEASDALE et al., Defendants.**

**Nos. 77–04008–CV–C, 75–CV–100–C and 78–04093–CV–C.**

United States District Court, W. D. Missouri, C. D.

May 23, 1980.

Michael J. Hoare, Chackes & Hoare, St. Louis, Mo., Richard J. Boardman, Clayton, Mo., Susanna Jones, Columbia, Mo., for plaintiffs.

Michael Boicourt, William F. Arnet, Asst. Attys. Gen., Jefferson City, Mo., for defendants.

## OPINION

ELMO B. HUNTER, District Judge.

This is the second portion of a class action challenging numerous conditions at the Missouri State Penitentiary. The first portion of the case dealt with overcrowding and sanitary conditions. *See, Burks v. Walsh*, 461 F.Supp. 454 (W.D.Mo.1978), *aff'd sub nom. Burks v. Teasdale*, 603 F.2d 59 (8th Cir. 1979). Here, plaintiffs have challenged the constitutional adequacy of various aspects of medical treatment inmates receive at the Missouri State Penitentiary Hospital ("MSPH") under the 8th and 14th amendments to the United States Constitution.[1]

---

1. This complaint was originally filed in 1975, but was refiled on January 14, 1977. The following cases are herein consolidated: *Burks, et al. v. Graham, et al.*, No. 77–4008–CV–C;

Specifically, plaintiffs seek an order for declaratory and injunctive relief regarding (but not limited to) the following areas in defendants' health care delivery system: (1) to restrain guards from inflicting unnecessary pain on MSPH prisoner patients and to post the order throughout the hospital; (2) to prohibit nonphysicians from performing nonemergency surgery; (3) to prohibit any surgery at MSPH which involves blood. transfusions or general or spinal anesthesia except in emergency situations; (4) to mandate the hiring of more custodial personnel to accompany inmates who must be sent to other medical facilities; (5) to prohibit defendants' employees from writing violation reports for alleged malingering except with the written authorization and approval of the Chief Medical Officer; (6) to mandate the institution of an evaluative review of the civilian medical assistants who are employed at MSPH, and a timetable for any further training that an individual medical assistant might require; (7) to mandate that defendants employ the equivalent of two full-time physicians at MSPH at least 5 days a week and 8 hours a day; (8) to mandate the continuation of the Correctional Medical Services Program until there are two full-time physicians; (9) to mandate the hiring of sufficient numbers of registered nurses in order to offer round-the-clock coverage on MSPH's second floor; (10) to mandate the hiring of a registered nurse to supervise and assist the medical assistants during sick call; (11) to mandate the initiation of a uniform record keeping system and to institute a record keeping training program for the inmate nurses and the medical assistants; (12) to mandate the hiring of civilians to work in the medical record department and prohibit the use of inmates for this purpose; (13) to mandate the writing of protocols for common diseases for use by the medical assistants at sick call; (14) to mandate the provision of chairs at sick call and the provision of greater privacy at sick call; (15) to mandate the staffing of the Intensive Care Unit ("ICU") with a registered nurse or medical assistant 24 hours a day; (16) to mandate the provision of a monitor, defibrillator and other life saving equipment in the ICU; (17) to mandate the installation of a standard nurse call button system for nonambulatory patients; (18) to mandate the hiring of a full-time professional registered physical therapist to work in the Physical Therapy Department; (19) to prohibit the confining of any inmate on the fifth floor psychiatric ward without physician approval, or in the absence of a physician, upon a physician's verbal order; (20) to prohibit the use of restraints on the fifth floor psychiatric ward except under direct orders from a physician and mandate the review of such an order every 12 hours thereafter; (21) to mandate the production of data on all inmates who have chronic conditions in order to assess these inmates' working and living arrangements.

The case was fully tried to the Court from February 11, 1980, through February 22, 1980, in Jefferson City, Missouri.

This action is brought pursuant to 42 U.S.C. § 1983 and this Court has jurisdiction conferred through 28 U.S.C. § 1343(3) and (4) and 28 U.S.C. § 2201 and 2202.

## I.

## THE CONSTITUTIONAL STANDARDS FOR INMATE MEDICAL TREATMENT

■ This Court's inquiry into the medical treatment of inmates at MSPH must be prefaced by an exposition of the applicable constitutional limitations that guide judicial review.[2] The Supreme Court has declared in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the appropriate

---

*Douglas Thompson v. Joseph Teasdale, et al.*, No. 75–CV–100–C; and *Darryl Hines v. Joseph Teasdale, et al.*, No. 78–4093–CV–C.

**2.** An extended discussion of these principles is not necessary as they have been adequately detailed in the first portion of this case. See,

*Burks v. Walsh*, supra, 461 F.Supp. at 479–83. See also, Neisser, *Is There a Doctor in the Joint?* The Search for Constitutional Standards for Prison Health Care, 63 Va.L.Rev. 921 (1977).

scope of review in prisoner medical treatment cases. The Court there stated:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoners' needs or by prison guards in intentionally denying or delaying access to medical or intentionally interfering with the treatment once proscribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983. 429 U.S. at 104–05, 97 S.Ct. at 291.

■ The Court further noted that not all claims of inadequate treatment or claims amounting to medical malpractice for negligence in treatment or in diagnosis are sufficient to allege a constitutional violation. *Id.* at 105–06, 97 S.Ct. at 291–92. *See also, Bowring v. Godwin,* 551 F.2d 44 (4th Cir. 1977); *Parrilla v. Cuyler,* 447 F.Supp. 363 (E.D.Pa.1978); and Recommended Procedures for Handling Prisoner Civil Rights Cases in the Federal Courts, Report of Prisoner Civil Rights Committee of the Federal Judicial Center, pp. 37–39 (1980). There are alternative forums for claims of this type. *Estelle v. Gamble, supra,* 429 U.S. at 107, 97 S.Ct. at 292.

■ In addition to the teachings of *Estelle,* constitutional litigation in the area of prison conditions has been extensively analyzed by numerous Supreme Court decisions. *See, e. g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935

(1974); and *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In sum, the Supreme Court has affirmed the need for courts to grant the proper discretion to prison professionals who are relatively more expert in the day to day practicalities of managing the contemporary penal institution. *See, Bell v. Wolfish, supra,* 99 S.Ct. at 1886. Of course, the foregoing admonitions to avoid interference in prison management give way in the face of clearly demonstrated constitutional violations. The constitutional rights of inmates are to be "scrupulously observed." *Id.* Further, the policy of deference to prison officials has been held to be accorded lesser weight in the area of medical treatment given that the concerns of prison security are of somewhat lesser magnitude. *See, Todaro v. Ward,* 565 F.2d 48 (2nd Cir. 1977).

It is within this constitutional framework that this Court undertakes a review of the alleged deficiencies in the conditions at MSPH.

## II.

### INTRODUCTION

MSPH is a five story structure located within the walls at the Missouri State Penitentiary.[3] The first floor houses the surgery department, laboratory, x-ray department, ear-eyes-nose-throat department, pharmacy, hospital records department, a casting room, sick call clinic, an emergency treatment room and the Chief Medical Officer's office. The second floor of the hospital contains 47 patient rooms, the ICU, a nursing station and the office of the Director of Nursing. The third floor of the hospital has 39 geriatric patient rooms, a nursing station and the office of the civilian supervisor. The fourth floor contains the communicable disease ward. The fifth floor is the psychiatric ward and contains 10 patient rooms. The ground floor of the hospital houses the physical therapy department and the dental department.[4]

---

**3.** For an extensive description of the physical plant at the Missouri State Penitentiary, see this Court's earlier opinion. *Burks v. Walsh, supra,* 461 F.Supp. at 456–462.

**4.** Upon completion of the plaintiffs' case, defendants moved to dismiss all claims relating to the dental treatment that inmates receive. No

MSPH is staffed full time by the following civilian personnel.

| NAME | DATE OF EMPLOYMENT | JOB TITLE |
|---|---|---|
| Richard Bowers, D.O.[5] | 9/ 1/77 | Chief Medical Officer |
| Raymond Kalfus, D.D.S. | 5/ 1/77 | Dentist |
| Donald Liddicoat, R.Ph. | 10/ 1/76 | Registered Pharmacist |
| James Gross, M.A. | 5/ 1/75 | Clinical Psychologist |
| Lorraine Ernst, R.N. | 12/ 1/71 | Registered Nurse |
| Steven Howard | 5/ 1/77 | Laboratory Technician |
| Lyle Fosler | 1/28/74 | Hospital Administrator |
| Wendell Schlueter | 6/ 1/76 | Medical Records Clerk |
| Selma Hansen | 11/15/76 | Pharmacist Assistant |
| Lawrence Benton | 8/14/77 | Medical Assistant I |
| Robert Briggs | 12/18/78 | " |
| Calvin Goodwin | 11/ 5/79 | " |
| Charles Hoose | 3/ 7/77 | " |
| Arthur Stafford | 10/22/79 | " |
| James Turner | 8/27/79 | " |
| Grover Van Winkle | 7/23/79 | " |
| Melvin Walker | 12/18/78 | " |
| Edgar Ambler | 2/27/78 | Medical Assistant II |
| Floyd Cain | 2/ 1/54 | " |
| Fred Counterman | 9/21/77 | " |
| Richard Evans | 9/ 1/74 | " |
| William Kessler | 9/ 6/77 | " |
| Vaughn Swearngin | 10/10/78 | " |
| Allen Vaughn | 10/15/74 | " |
| Gerald Wireman | 3/27/78 | " |

In addition to the full time personnel listed above, MSPH has arrangements for the services of other health care professionals—both within and without the prison. Regarding the former, MSPH retains, part time, the following private, "consultant" doctors who practice in the mid-Missouri region:

| NAME | DATE OF EMPLOYMENT | SPECIALTY |
|---|---|---|
| Harry Agniel, O.D. | 6/ 1/51 | Optometrist |
| Stuart Exon, M.D. | 7/ 1/57 | Surgeon |
| Lawrence Giffen, M.D. | 8/ 1/72 | Dermatology & General Practice |
| Fred Handler, M.D. | 6/ 1/56 | Pathologist |
| Larry Courter, M.D. | 1/ 1/74 | Radiologist |
| Byron Watts, M.D. | 2/ 1/60 | Radiologist |
| Richard Heimburger, M.D. | 5/ 1/78 | Plastic Surgeon |
| Alan Braun, M.D. | 12/ 1/79 | Internal Medicine & Cardiology |
| Alan Doerhoff, M.D. | 7/ 1/74 | Surgeon |
| Otto Rieke, D.D.S. | 7/ 1/70 | Dentist |
| Clayton Johnson, D.D.S. | 9/ 3/74 | Dentist |
| Richard Omohundro, D.D.S. | 8/ 1/78 | Dentist |
| Richard F. Graham, D.D.S. | 9/ 3/75 | Oral Surgeon |
| Jonathan Hanson, D.D.S. | 9/ 3/75 | Oral Surgeon |

| NAME | DATE OF EMPLOYMENT | SPECIALTY |
|---|---|---|
| Larry K. Stauffer, M.D. | | Ophthalmologist |
| John Pauzauskie, C.R.N.A. | 12/ 1/78 | Nurse Anesthetist |
| Zaki Ajans, M.D. | 10/16/70 | Psychiatrist |
| David Elledge, D.D.S. | 8/ 1/78 | Dentist |

Also, in January, 1980, MSPH initiated a "consulting service" or the Correctional Medical Services Program which is composed of resident physicians from the University of Missouri Medical Center in Columbia, Missouri ("UMMC"). These doctors perform emergency services, conduct sick call and make hospital rounds. These physicians staff MSPH Monday–Friday from 6:00 p. m. to midnight, and work 9:00 a. m. to 6:00 p. m. on Saturdays and Sundays.

When necessary, outside facilities are utilized by the inmates at MSPH through a process of referrals. Inmate patients are referred to UMMC, the Veterans Administration Hospital in Columbia, Missouri, the Ellis Fischel State Cancer Hospital in Columbia, Missouri, and the Fulton State Mental Hospital in Fulton, Missouri. Patients are transferred to these facilities in prison vehicles. In the event an ambulance is required, MSPH has contracted for the use of the ambulance service of Charles E. Still Hospital in Jefferson City, Missouri.

MSPH is also a referral institution for emergency cases from various "satellite" correctional institutions, e. g., Renz Farm, Church Farm, Fordham Honor Camp, Moberly, Algoa, among others.

### III.

The testimony and documentary evidence at the two week trial extensively detailed the operation of MSPH both on a policy level and as regards particular treatment received by various inmates. In order to clarify the issues raised in this action, this Court will review the evidence organized in relation to the specific deficiencies alleged by plaintiffs.

**5.** Dr. Bowers resigned his position at MSPH in late February, 1980. He has been replaced since the time of trial by Dr. Carl Baker, M.D.

objection was tendered by plaintiffs and the motion was granted.

## A. STAFF TRAINING, EVALUATION AND SUPERVISION

Plaintiffs have broadly challenged the quality of the staff and the review of staff services at MSPH.

### 1. Background and Ongoing Training of Medical Assistants and Inmate Personnel

*Mr. Lyle Fosler*

Mr. Fosler is the hospital administrator at MSPH. He serves under the Chief Medical Officer in an administrative capacity. He holds a B.S. degree from Northwestern University and has had substantial experience in his field prior to his arrival at MSPH in January, 1974.

Mr. Fosler testified that the medical assistants are divided into two classes—Medical Assistant 1 and Medical Assistant 2. The Medical Assistant 1's are supposed to assist the physicians and other nursing personnel. They perform any number of functions and are supposed to work under the supervision of higher level medical personnel. The Medical Assistant 2's have greater experience and are used for more responsible assignments, such as assisting in surgery and conducting sick call. As well, the medical assistants are supposed to dispense prescribed medication and administer injections. They are under the supervision of the physicians. Mr. Fosler also testified regarding the background and experience of the medical assistants. Together with Mr. Fosler's testimony and plaintiffs' exhibits Nos. r–1 through r–17 and defendants' exhibit No. 294, the following is a synopsis of the qualifications of the medical assistants:

### MA 1's

1. Lawrence Benton. Mr. Benton's background includes 92 hours of college work (partially pre-med) at Albemarle College in Elizabeth City, North Carolina. Mr. Benton has worked as a driver-attendant for an ambulance service, a freight manager, an insurance agent, and as a dark room technician. Mr. Benton has successfully completed the "EMT" or Emergency Medical Services Training Program (81 hours) at UMMC. He received his certificate in April, 1977. He is qualified by the American Association of Physicians' Assistants as a physicians' assistant and is a member of the American Association of Trauma Specialists.

2. Robert Briggs. Mr. Briggs is a licensed practical nurse and has had medical training in the military.

3. Calvin Goodwin. Mr. Goodwin has a background in the military. He served as a medical specialist. He also has recently completed two physicians' assistant courses.

4. Charles Hoose. Mr. Hoose is a high school graduate and has completed the EMT course and is a qualified physician's assistant. Further, Mr. Hoose has attended numerous workshops and continuing education courses in various medical fields.

5. Arthur Stafford. Mr. Stafford has received medical training in the military and is possessed of a certificate from the Missouri Department of Mental Health certifying that he completed the "Psychiatric Aide One Course". He has also completed the American Heart Association course on Basic Life Support Technique.

6. James Turner. Mr. Turner has a high school education. His prior employment was with the police department in Robert, Missouri. His duties were described as "animal control". He has been a medical specialist in the military. He also has worked at a nursing home.

7. Grover Van Winkle. Mr. Van Winkle's background was as a medical specialist in the military. He possesses numerous medical training certificates from the United States Army. He also completed an EMT course while in the Army.

8. Melvin Walker. Mr. Walker has a high school education. His records indicated that he was a medical specialist in the military.

### MA 2's

1. Edgar Ambler. Mr. Ambler has two bachelor of science degrees in biology and

education from Central Missouri State University in Warrensburg, Missouri. Mr. Ambler has an extensive background and experience in the medical service field during his tour of duty in the military. His military career in the medical service area was described as "remarkable" at trial. He possesses numerous citations. He has also worked at Charles Still Hospital in Jefferson City.

2. Floyd Cain. Mr. Cain has worked at MSPH since 1954. Plaintiffs' Exhibit R–12 reveals that the defendants no longer possess his employment application.

3. Fred Counterman. Mr. Counterman is a high school graduate and has completed the UMMC EMT course. He also served as a medical corpsman in the military.

4. Richard Evans. Mr. Evans has a 9th grade education. He completed a course of 520 hours at the State Hospital No. 1 School for Psychiatric Aides in Fulton, Missouri. He served as a Psychiatric Aide 1 at the Fulton State Hospital for approximately 7 years.

5. William Kessler. Mr. Kessler is a high school graduate. He had worked previously at Humphreys Hospital and at MSPH. From 1973 to 1979 he worked at Charles Still Hospital in the collections department.

6. Vaughn Swearngin. Mr. Swearngin holds an associate of arts degree from State Fair Community College in Sedalia, Missouri. He has worked as a hospital assistant for the State of Missouri and was involved in medical services in the military.

7. Allen Vaughn. Mr. Vaughn's background is not well documented in the record. His application for employment shows a long tenure with the military and approximately three years as a nursing assistant at a soldiers home.

8. Gerald Wireman. Mr. Wireman is a licensed practical nurse.

Mr. Fosler further testified that the medical assistants get the Physicians' Desk Reference Book and the Merck Manual which are first level symptom and diagnosis references. He stated that the library at the hospital has over 200 volumes of medical books and numerous subscriptions to medical periodicals.

Various minutes of civilian staff meetings dating from 1974 through 1979 were admitted into evidence over defendants' objections. See, Plaintiffs' Exhibits A–1 through A–37. The minutes are few in number. Mr. Fosler stated that such staff meetings were held irregularly because they were not necessary in light of the type of operation at MSPH.

*Dr. Richard Bowers*

Dr. Bowers was at the time of trial the Chief Medical Officer at MSPH. He is 32 years old and a doctor of osteopathy. He is not on any hospital staff and has no admitting privileges in any private hospital. His previous employment was at Charles Still Osteopathic Hospital in Jefferson City, Missouri.

On September 1, 1977, Dr. Bowers was appointed Assistant Chief Medical Officer at MSPH. He worked directly under Dr. Edwin A. Key, who was Chief Medical Officer until November 1, 1979, when he died. Dr. Bowers succeeded Dr. Key and stated that he had been attempting to secure a new assistant but had been unable to locate one.[6]

Dr. Bowers testified that he is familiar with the training of the paraprofessionals at MSPH. He stated that the medical assistants do a considerable amount of their own education. He testified that the medical assistants review films from drug companies on new treatments and medical procedures, and that the medical assistants attend seminars in various medical areas. Dr. Bowers did admit, though, that some of the medical assistants were not as interested as others in keeping up in their field.

Further, Dr. Bowers stated that the work of the medical assistants was generally evaluated from time to time. But, he stated that he did not meet with each employee

---

**6.** Dr. Bowers testified that he was "burning out" in the Chief Medical Officer position. He has accepted a job as staff physician at Fulton State Hospital in Fulton, Missouri.

on any regular basis and did not review the medical files for purposes of evaluation.

*Ms. Lorraine Ernst*

Ms. Ernst is a registered nurse. She is 61 years old and she has worked at MSPH for approximately 10 years. She has an extensive background in her nursing career. She is the supervisor of all inmate "nurses".

Ms. Ernst testified, in detail, regarding the training that she conducts for the inmate nurses. She stated that all inmates who desire to work in the hospital must complete a training course. The course consists of two hours per day, 5 days per week, of classwork for 10–12 weeks. Each inmate is given a 150 page training book that covers many areas of medical procedure. The course covers medical terminology, ethics, medical record keeping, and daily routine care. She stated that 11 training films are shown to the inmates and that in addition to her lectures, speakers from UMMC and Lincoln University in Jefferson City, Missouri lecture the inmates. The inmates are taught to do eye, ear, nose and throat examinations, enemas, catherization, blood pressure readings, temperatures, bed making, and bathing techniques. They learn anatomy and must learn to draw all important systems of the body. The inmates are given exposure to x-ray techniques, but only inmates with advanced training are allowed to work in the x-ray department. Following successful completion of the course, inmates are assigned to work on the floors for 12 hours a day, from 6:15 a. m. to 6:15 p. m.

The training course is offered twice a year and usually 20 inmates enroll. Only 8 or 9 actually complete the training to become inmate nurses. Ms. Ernst revealed on cross-examination that not all inmate nurses had completed the course. Of the inmates who worked on her floor, only 4 have received training in the course.

Ms. Ernst compared the quality of care by inmate nurses favorably to regular nursing in a private hospital. She felt that MSPH's training program for aides of this type was better than comparable programs in private hospitals.

*Father Thomas Vaughn*

Father Vaughn is a thirty year old Catholic priest. He had worked as a Nursing Assistant[7] at MSPH from March, 1974, through September, 1974, and from the end of May, 1975, through September 1975. He had worked prior to these times as an orderly at Jefferson City area hospitals. He was not a priest at the time he worked at MSPH.

Father Vaughn testified that he merely took a merit examination and became a Nursing Assistant 2. He stated that he received no formal instruction, except for one session on how to conduct himself around inmates.

The bulk of Father Vaughn's testimony indicated his feeling that he was practicing medicine without adequate training and that he worked without any supervision. He stated that he personally administered insulin shots for diabetics, prescribed demerol and other drugs without physician approval, gave penicillin shots for suspected cases of venereal disease, and gave physical examinations with no training in diagnosis. In many of these instances, he testified that he did not record the treatment in the patient's medical chart. He stated that he often would refuse medication if he didn't believe the inmate needed it. He testified, at length, about one incident where an inmate patient on the fifth floor had been complaining, hysterically, of seeing a cat in his cell. He stated that the inmate was placed in restraints, given thorazine and sprayed with mace in his face by prison guards. Father Vaughn failed to explain, during questioning by the Court, why he did not call for a doctor during this incident.

On cross-examination, Father Vaughn admitted that he had no idea of how the prison hospital was run after September, 1975. He also stated that a doctor was present or on call always. Further, he stated that he had never harmed anyone and

7. The title nursing assistant has now been changed to medical assistant.

that he never exhibited an indifference to a patient's medical needs. Lastly, Father Vaughn's application for employment for the summer of 1975 stated that his duties previously had been "patient care via doctors orders." He testified that this had not been a lie when he wrote it.

### 2. *Medical Records at MSPH*

*Dr. Robert Karsh*

Dr. Karsh is a medical doctor from St. Louis, Missouri. He is a graduate of Washington University School of Medicine. His specialty is internal medicine. He has admitting privileges at Jewish, Barnes and Missouri Baptist Hospitals in St. Louis. He is a member of the American Civil Liberties Union and was retained by plaintiffs to serve as an expert in this case.

Dr. Karsh visited MSPH on October 16, 1975, and again on February 12, 1980. He testified that he reviewed over 200 medical charts in preparation for his testimony. His review took 20 hours to complete. He spent a total of 6 hours at the penitentiary hospital.

The importance of proper medical charting was emphatically stressed by Dr. Karsh. He stated that a proper medical record should include all things necessary for a patient's care. Specifically, a medical chart should include the patient's complaint, tests performed, the physician's diagnosis, the treatment utilized, and whatever follow up was required. The need for these basic elements is essential for a "continuity of care" should the patient be seen by different doctors in the future.

Dr. Karsh's general conclusions regarding the state of record keeping at MSPH were that the records are grossly inadequate. He was of the opinion that the records did not contain the minimal elements necessary for patient care. His conclusions followed extensive testimony regarding particular medical charts. In order to properly review the testimony relating to the quality of the medical charts, it is necessary to summarize Dr. Karsh's observations on various anonymous medical charts produced by defendants.

a. Exhibit F–7. This chart lacks sufficient documentation for the use of a nasal gastric tube in conjunction with a barium enema. Dr. Karsh was unable to review the appropriateness of the treatment prescribed.

b. Exhibit F–12. The inmate had complained of a wart on his lower right eyelid. The chart reflected that he was sent to a consultant for removal of the wart. No report of what followed was included. Cross-examination revealed that the report was only kept for what had occurred at MSPH. The inmate had been at another institution and had just been transferred to MSPH prior to his transfer to UMMC for the removal operation.

c. F–20. The chart did not reflect any blood tests and no venereal disease history had been produced. The inmate had been convicted of rape and sodomy and was seen at the hospital for a skin rash. Dr. Karsh considered this to be a possible symptom of syphillis and was surprised, given this inmate's background, that no blood tests were indicated in the record.

d. F–26. This inmate was admitted to the penitentiary in 1970. In September, 1975, he was diagnosed with gonorrhea. He was given antibiotics. No follow up was recorded in the chart. His record shows he returned to sick call numerous times and he received differing treatments for the same general symptoms. Dr. Karsh concluded that there was a need for an investigation of any sexual contacts the man may have had and to properly follow up to determine if he had been cured.

e. F–27. The chart reflects three contractions of gonorrhea. No follow up was reflected in the chart to determine if the inmate had ever been cured of the disease.

f. F–102. This patient exhibited symptoms of an ulcer. In January, 1979, an upper G.I. test was performed. In March, 1979, the patient was suspected of being a malingerer. Dr. Karsh felt that the patient could have been a malingerer or he could have truly have had an ulcer. The record does not resolve the issue.

g. F–103. This patient's chart revealed that no heart trouble was indicated in the entrance physical given to him upon his arrival at the penitentiary. He entered the prison in 1971. In 1975, an EKG exam was performed and it showed some irregularities. In June, 1976, strange heartbeats were recorded. In September, 1976, the EKG revealed that the inmate had severe damage to a wall of his heart. There was no evaluation of the EKG in the medical chart. The inmate was found dead in his cell on February 7, 1977. A letter from Dr. Key to Warden Wyrick indicated that the patient had a long history of heart disease, but no documentation of his condition was indicated in the record. No record of an autopsy was included. It was learned on cross-examination that all autopsy reports were kept under lock and key in the Chief Medical Officer's office.

h. F–104.[8] Dr. Karsh noted that an entry dated May 23, 1979, stated that this patient was a post-operative "gold bladder" case. Dr. Karsh observed that this patient had a high blood pressure following his operation, and that on a number of occasions, his medical chart does not reflect blood pressure having been taken. The chart indicates that on September 11, 1979, an analgesic was prescribed, but no blood pressure was taken. On November 21, 1979, enderal was prescribed, which is used for heart pain according to Dr. Karsh, but the record did not reflect why it had been prescribed. On December 19, 1979, the patient had an abnormal heart beat and an EKG was performed, but again, no blood pressure reading was indicated in the record. On December 21, 1979, an EKG test showed that there had been injury to his heart.

Dr. Karsh was also quite critical of the record insofar as it indicated that the patient's gall bladder was removed without proper diagnosis. The record merely shows that a dye test was performed and that the gall bladder was "non-visualized" on the x-ray. Dr. Karsh stated that there can be a number of reasons for non-visualization, and as such, the test should be performed more than once. Vomiting, failure to take the dye pills, or diarrhea are just some of the causes of non-visualization. Dr. Karsh was critical of the surgeon's (Dr. Alan Doerhoff) post-operative note in that it failed to describe what he had done. Dr. Karsh further noted that it was unusual that no pathology report was included in the file. In fact, a pathology report was prepared and had been sent to Dr. Bowers. The report indicated a perfectly healthy gall bladder. During Dr. Bowers cross-examination, it was revealed that the report had been buried in Dr. Bower's desk drawer.

i. F–106. This patient's record showed 10 visits on an out-patient basis for "back pain". The record showed that he was being treated for a back problem but there was no evidence of any x-ray having been performed.

j. F–111. This inmate's admission examination at the time he entered the prison indicated that he was deaf. There was no entry in the chart about whether the inmate had a correctible form of deafness or whether a hearing aid would be effective.

Dr. Karsh toured MSPH for two hours the evening prior to his testimony and reviewed the charts of patients who were presently being treated.

a. Patient K. This inmate was on the fifth floor of the hospital for evaluation by the psychologist, Mr. Gross. He was being given lithium and a drug referred to as INH which is used to treat tuberculosis. Nothing in the chart indicated why he was receiving INH, but on cross-examination it was revealed that this patient had been exposed to tuberculosis.

b. Patient G. He was admitted on February 8, 1980, for hepatitis. The chart reflected that he had not been seen by a doctor for 4 days, and that no laboratory work had been performed.

---

8. In accordance with Dr. Karsh's testimony regarding this record was the testimony of Dr. Donald Sauer. Dr. Sauer is a medical doctor from St. Louis, Missouri.

c. Patient C. This patient had diabetes. There was no admission history, although there were copious notes about blood sugar and urine.

d. Patient G. Admitted for cardiac evaluation on February 9, 1980, this inmate's chart reflects that the first note on his heart condition was not placed in the record until February 11, 1980.

e. Patient C. This unusual patient was post-operative for colon cancer. This patient first had colon cancer surgery at MSPH in 1967. Dr. Karsh noted that it is highly unusual for anyone to survive this long once having undergone surgery for colon cancer. The chart following the second operation does not reflect any post-operative visit by the surgeon.

In summary, Dr. Karsh concluded that the records were woefully incomplete and inadequate, that the skill of those making the entries in the records was very low, and that either these people had not been trained or they had forgotten what they had learned. He noted that virtually all entries were unsupervised, and there were very few that had been countersigned by a physician. Dr. Karsh felt that the consequences of such poor record keeping could pose danger and a potential for tragedy. His opinion was that the records were evidence of very poor care and of negligence in certain instances and a deliberate indifference to serious medical needs in others. He admitted that he was comparing the level of hospital care in the penitentiary hospital with the equivalent level of care that he was familiar with in his private practice. Further, he based his testimony on the premise that inadequate records result in inadequate care.

*Dr. George C. Gardiner*

Dr. Gardiner is a medical doctor from Philadelphia, Pennsylvania. He is a psychiatrist at present. He received his medical degree from Tufts University in 1961. Along with excellent credentials in the field

of psychiatry, Dr. Gardiner staffs the Philadelphia State Hospital. He has a working familiarity with prison hospitals. In 1972, he worked on a health law project under the aegis of the University of Pennsylvania Law School which investigated the delivery of health care in four state prisons in Pennsylvania. He wrote an extensive report following the study.[9] He was also familiar with the use of paraprofessionals in delivering medical services during his tenure as director of the Southeast Philadelphia Health Center.

Dr. Gardiner toured MSPH on October 16, 1975, and again the evening before his testimony.

On the issue of medical records, Dr. Gardiner testified that he had examined over 80 medical records and his general conclusion was that the level of record keeping was grossly inadequate. He stated that he found a repetitive pattern of such poor histories and physical examinations that he could not reconstruct the patients' medical backgrounds. He found a lack of diagnosis and mere entries of medications prescribed without a reason for their application. Dr. Gardiner concluded that the supervision of the medical staff's record keeping function was inadequate.

Dr. Gardiner stressed the concept of "continuity of care". Briefly, he testified that adequate records are essential in order to provide future medical personnel with an accurate understanding of a patient's history, diagnosis, and mode of treatment. In his opinion, the minimum contents of a medical record should include: (1) chief complaint; (2) past medical history; (3) physical examination; (4) laboratory studies; (5) treatment; and (6) progress notes of the physician. He stated that there is a strong connection between the level of care provided and accurate medical records. He further observed that poor record keeping indicates an atmosphere of unconcern.

---

**9.** See generally, University of Pennsylvania Law School, Health Law Project, Health Care and Conditions in Pennsylvania's State Prisons (1972), reprinted in ABA Comm'n on Correctional Facilities and Services, Standards and Materials on Medical and Health Care in Jails, Prisons, and Other Correctional Facilities 71 (1974).

Dr. Gardiner commented on a number of specific cases that he observed during his evening visit to MSPH. On the fifth floor, Dr. Gardiner examined two patients. His conclusions are summarized as follows:

Patient C37781. This patient's chart reflects that he was receiving a drug to counteract the effect of tranquilizers. The chart did not reflect that the patient had received any tranquilizers.[10] Also, there was no indication of the patient's medical problem. This patient was also receiving lithium—a drug used to treat depression. Dr. Gardiner noted that no blood serum lithium level tests were indicated. Dr. Gardiner stated that these tests are essential for proper treatment with this drug. These tests should be performed daily at first, and then with decreasing frequency.

Patient C36440. This patient's chart showed the administration of the drug thorazine without a physician's oral or written order. The patient's sick call records indicated that he had been on the drug for a long time, but no reason was advanced for its use. Also, there was no reason given in the chart for the patient's admission to the psychiatric ward.

On the fourth floor, Dr. Gardiner inspected the chart of a patient admitted for hepatitis. The chart reflected no past history, and no evidence of laboratory tests performed, other than a liver enzyme test. Dr. Gardiner said he would have expected blood tests and urinalysis tests to have been performed.

With regard to the anonymous charts supplied by defendants, Dr. Gardiner made these observations:

a. Exhibit F–47. The patient was admitted complaining of anxiety. No diagnosis was present. A drug was prescribed that was not ordered by a doctor.

b. Exhibit F–77. The chart indicated numerous visits to sick call for bad nerves and insomnia. Many of the entries were illegible and there was little evidence of follow-up work. On cross-examination, Dr. Gardiner agreed that this patient had not necessarily been denied care and that many of his disagreements were based on a difference of medical opinion.

c. Exhibit F–110. This patient was given powerful antidepressant drugs over a long period with no apparent reason indicated for their use. On June 26, 1978, the patient was given an unspecified dose of such a drug. Dr. Gardiner stated that the dosage given is an essential part of a medical chart entry—especially here given the toxic effects of this particular drug. No reasons appeared for the changes from one drug to another and many of the doses were too low to have been effective if this patient truly suffered from depression.

d. Exhibit F–29. This inmate had been a patient on the fifth floor. Dr. Gardiner found the record to be inadequate to support the course pursued. Particularly, Dr. Gardiner failed to locate a proper basis in the chart for the use of physical restraints.

e. Exhibit F–111. This chart contains entries for the year 1979. Dr. Gardiner was impressed with the entrance physical examination form and the quality of the entries on this chart.

f. File of Fred Pridgett.[11] This file was of great concern to Dr. Gardiner. There were repeated admissions to the psychiatric ward noted with no reasons indicated. There were medications prescribed by verbal order. Specifically, Dr. Gardiner was disturbed by an entry written by medical assistant Richard Evans on September 30, 1978.[12] Dr. Gardiner felt that such an entry

---

10. Dr. Gardiner stated later in his testimony that he observed on this inmate's out-patient records (which are kept on a different floor) that the inmate had been receiving a tranquilizer.

11. Mr. Pridgett testified in this action.

12. "9:05 a. m. Patient told me at this time that the medicine that he is getting is making him sick therefor he refused to take his morning P.O. medicine which is thorazine conc 75 mg Q.I.D. patient also has a P.R.N. order of thorazine 100 mg. ImM. for agitation by all indications it appears that patient will not take his medication because he knows that if he don't take his P.O. medication we'll have to call cus-

reflected a lack of training and professional objectivity—even given the difficult nature of this patient. There was no evidence presented that Mr. Pridgett was ever subjected to Mr. Evans' proposals.

The general opinions advanced by Dr. Gardiner were that serious medical needs at MSPH were not being adequately assessed. He stated that many needs are probably unknown because of the state of the records. He concluded by noting that the poor state of record keeping is directly attributable to the level of staff training and supervision.

*Dr. Barbara Starrett*

Dr. Starrett is a medical doctor from New York City where she now practices as an internist. She is former head of medical services at Riker's Island Correctional Institution which serves the New York metropolitan area. The facility houses a pretrial and misdemeanor population of both men and women. Dr. Starrett has a great deal of experience in the delivery of health care to a prison population.

Dr. Starrett toured MSPH on February 5, 1980, for three hours. She stated that she read several medical records, depositions, and the standards for health care in correctional institutions of the Law Enforcement Assistance Administration, the American Correctional Association, and the United States Department of Justice.

Concerning medical records, Dr. Starrett found them to be totally inadequate. She found that many charts lacked data collection and diagnosis. Her opinion was that such medical records could lead to bad health care through the risk of excessive or inadequate treatment. She felt that the medical records and the hospital as a whole could be improved by instituting a program of professional standards review conducted by an outside evaluation group.

Further, Dr. Starrett testified that no inmates were used to work in the facility at Riker's Island. She stated that the information in the medical charts was confidential and could be put to nefarious uses by other inmates. Dr. Starrett did recognize, however, that part of the reason for the nonuse of inmates was that they were at Riker's Island for a period of one year or less.

Dr. Bowers testified that the state of record keeping had not changed at MSPH since this suit was commenced. The Court asked if there was more effort exerted currently to keep better records. Dr. Bowers answered that things have remained unchanged. Dr. Bowers testified that there is no system of quality control or peer review. He stated that in his opinion, the records are adequate. He rejected the notion that the quality of medical care is dependent upon the quality of the medical records. Dr. Bowers further testified that medical records in a penitentiary hospital did not require the same degree of accuracy as in the general civilian population. Nevertheless, Dr. Bowers did recognize the importance of medical records at MSPH in light of the rotation of different doctors through the facility.

According to Dr. Bowers, there are no problems with some inmates having access to the medical files of other inmates. He indicated that he was unaware of any difficulties that could arise.

*Dr. Lawrence Giffen*

Dr. Giffen is a doctor of osteopathy in Jefferson City, Missouri. He is one of the consultant physicians at MSPH. He provides dermatology services. Dr. Giffen

tody to give him a injection and further more he's figured out that we won't put him on a restraint bed even when custody is called as long as he is quiet, patient lays on one side of his cell and urinates on the other he will not use his urine bottle or bed pan for these purposes he'll spit on the floors and walls, patient does not intend to cooperate with us any way at all he is nasty & wants to remain that way period patient incidentally is a regular on this floor & he's this way every time very nasty I don't see him changing any time soon however if he were placed in restraints and a cather inserted say for a few days I feel like we could get the patients attention real fast patient enjoy's having a honkie clean up after him and has expressed this thought many times to me & workers." [This is the exact quote. The many grammatical and spelling errors have not been altered.]

goes to MSPH once every two to three weeks. He treats rashes, skin lesions, etc. Also, he performs rectal surgery, biopsies and circumcision.

Dr. Giffen testified that the medical records at MSPH are adequate. Although, on cross-examination, it was revealed that he had stated in an earlier deposition that he thought there could be improvements in the medical records.

### Dr. Pasquale Ciccone

Dr. Ciccone is a medical doctor who was formerly the Chief Administrator for the United States Medical Center for Federal Prisoners in Springfield, Missouri. Prior to serving as Chief Administrator, he had been Chief Medical Officer at various prisons in the United States. There were 17 staff doctors at the Springfield facility and it had a 650 bed capacity. The facility provides intensive care services for the entire federal correctional system. He toured MSPH on January 10, 1980, and on February 5th and 6th, 1980. He reviewed approximately 10 medical charts in preparation for his testimony.

Dr. Ciccone stated that the form of medical card used for sick call was adequate. During his visit to the second floor of the hospital, he found the nursing notes in four charts to be adequate. He felt that more documentation could have been included. Also, he thought that there should have been more doctors' progress notes. Dr. Ciccone did not agree in the abstract that bad medical charting would lead to poor medical care. But, he testified that in a circumstance where many physicians are treating the same patient, the need for proper charting is increased.

Dr. Ciccone also testified regarding the evaluative reviews that were conducted at the Springfield complex. He stated that the method used to conduct the review was by selecting random medical charts and evaluating them and discussing what the medical expectations would have been for the patients. Thus, he concluded that medical records are an integral part of such a review process.

### Mr. Wendell Schleuter

Mr. Schleuter is the supervisor of medical files at MSPH. Prior to this employment, Mr. Schleuter was a food store manager for 29 years. He has had no specific training in hospital record keeping, and has never had a medical course.

He stated that the door to the medical records room is kept locked and that guards and one medical assistant have keys. There are two inmates who work in the medical records department and do most of the typing.

### 3. Surgery Performed by Nonphysicians

The plaintiffs have challenged the use of non-physicians to perform surgery except in emergency situations.

### Mr. Edgar Ambler

Mr. Ambler has been responsible for the surgery department since February 26, 1978. He "preps" the operating room prior to all procedures. Also, he preps patients who are to undergo surgery at MSPH.

During cross-examination, it was revealed that Mr. Ambler and other medical assistants had been performing surgery prior to and including 1978. Mr. Ambler described one incident that apparently led to a change in the surgical policies at MSPH. He stated that he had opened the leg of a "Mr. Douglas" in order to remove a bullet. The operation had been authorized by both Drs. Key and Bowers. The bullet slipped farther into the patient's leg causing Mr. Ambler to abort the procedure. The man was transferred to UMMC and the bullet was removed there. Mr. Ambler testified that following this experience, an oral directive came from the warden forbidding medical assistants from performing surgery. Mr. Ambler stated he had performed more than 12 operations mostly for the removal of warts and moles.

On September 11, 1978, Warden Donald Wyrick issued a memorandum that forbids the practice of allowing medical assistants to perform suturing on employees of the prison who were receiving treatment in the hospital. Mr. Ambler testified that the new

policy has been interpreted to apply to inmate patients as well.

Mr. Ambler further revealed that an inmate physician—"Dr. Bill Carlos"—had performed surgery. Dr. Giffen indicated that he knew of minor suturing that had been performed by both Dr. Carlos and another inmate physician—"Dr. Kenneth Kelsey." [13]

## B. ADEQUACY OF PRESENT STAFFING

Plaintiffs seek additions to the staff at MSPH in a variety of areas.

### 1. Need for Custodial Personnel to Transfer Inmates

Dr. Bowers testified generally about the referral system in use at MSPH. Basically, he stated that if a physician decides that a patient is in need of treatment at some other facility, then the patient is transferred.

Dr. Bowers stated that in an emergency, a referral can be arranged in 30 to 45 minutes. If the situation is not an emergency, then scheduling can take up to a week to arrange for transportation and custodial personnel. In Dr. Bower's view, the prison administration has been very cooperative and delays have been very short. He stated that there is no policy that limits the number of returns to an outside hospital. Dr. Bowers indicated that there were 339 referrals to UMMC in 1978 and 262 in 1979. He further stated that five to ten inmates travel to UMMC each week on an outpatient basis. One patient is receiving kidney dialysis and travels to UMMC three days each week. Plaintiffs complain that a lack of custodial personnel impedes access to these outside medical facilities.[14] To support their contention, they cite various occurrences involving inmates requiring treatment at outside facilities.[15]

### Mr. William Helming

Mr. Helming was formerly an inmate at MSPH. He is now 52 years old and lives at a retirement lodge in Columbia, Missouri. He is afflicted with a disease known as vasculitis. Mr. Helming testified that he was removed from UMMC where he was receiving "good" treatment and taken back to MSPH. He stated that he was supposed to have been returned to UMMC within one week, but that he was not returned for two weeks. Mr. Helming testified that his condition substantially worsened during the two weeks.

### Dr. Kim Coulter

Dr. Coulter is a medical doctor at UMMC. He has treated Mr. Helming since March 1, 1979. Dr. Coulter testified that upon his first examination of Mr. Helming, he observed skin lesions over portions of Mr. Helming's body. Ulcers had formed at various pressure points—the inside of both ankles and on his left calf. He weighed 122 pounds. Mr. Helming was allowed to remain at UMMC through March 29, 1979. Dr. Coulter stated that he had not completed his course of treatment, but Dr. Bowers had ordered Mr. Helming's return to MSPH citing a lack of guards available to supervise Mr. Helming at UMMC. Dr. Coulter testified that he would have preferred to have Mr. Helming remain at UMMC. Dr. Coulter sent word to Dr. Bowers that he wanted to see Mr. Helming every week. The first return appointment was set for April 5, 1979. Mr. Helming did not return

---

13. "Dr. Carlos's" background was as a registered pharmacist prior to 1960. He completed his studies at osteopathic colleges but never has been licensed in Missouri or elsewhere. He is serving a term in the penitentiary for having hired a contract killer. See, test. of Dr. Bowers. "Dr. Kelsey" was actually a medical doctor prior to his incarceration for the alleged murder of his wife. See, test. of Warden Wyrick. He now serves as a civilian medical assistant at MSPH. Apparently, his conviction was reversed on appeal.

14. At trial, this Court took judicial notice of § 216.244 RSMo which authorizes prisoner furloughs for various purposes including medical treatment. The Director of the Division of Corrections may authorize such furloughs for up to 30 days per year. The practical difficulty that this law imposes upon prison officials is that if a medical furlough is to exceed 30 days, then a guard is required at the outside facility. See, test. of Warden Wyrick.

15. See also. test. of Messrs. Hunter and Callahan.

until April 12, 1979. Dr. Coulter indicated that he was deeply troubled by Mr. Helming's condition upon his return. The lesions had grown much larger and there was dead tissue inside of the lesions that had a rotting smell. Dr. Coulter found new lesions on his palms, elbows, and in his mouth. Further, Mr. Helming had blood in his stool. He had lost 12 pounds in the two weeks he had been at MSPH. In Dr. Coulter's opinion, Mr. Helming was near death.

Dr. Coulter felt that at a minimum, good medical practice would have dictated the surgical removal of the dead tissue. Dr. Coulter was also critical of the medical record compiled at MSPH that did not detail the rather dramatic change in Mr. Helming's condition. In response to questioning by the Court, Dr. Coulter would not characterize Mr. Helming's treatment at MSPH as negligent, nor did he feel malpractice had been committed because of his unfamiliarity with the legal definitions of these terms. He stated that he would have hoped for more aggressive management of the quickly accelerating manifestations of the disease.

Vasculitis is an extremely rare disease and it was learned on cross-examination that it can flare up very quickly with no warnings. There was no dispute that Mr. Helming had been receiving all of the medications prescribed by Dr. Coulter during the two week stay at MSPH.

*Mr. Richard Page*

Mr. Page is serving a term in the penitentiary for manslaughter and assault that began on December 29, 1977. Since September, 1978, Mr. Page has had a chronic condition of blood in his urine. He testified that he appeared at sick call numerous times and was given a variety of pills—none of which accomplished anything. On November 4, 1978, he was admitted to MSPH. He remained for four months. A large number of tests were performed and he was sent to UMMC on a number of occasions for examination by specialists. Nevertheless, his medical records reveal that Dr. Bowers had difficulty in sending him to UMMC in February 1979, because of a "custody coverage" problem. Apparently, no diagnosis was ever reached. Mr. Page claims that he still possesses the condition. He testified that his treatment was good at UMMC, but that he has not been back since April, 1979. He further testified that he was supposed to go back in August, 1979, but was not sent back.[16]

Dr. Bowers stated that Mr. Page's condition is extremely unusual. He testified that the doctors at UMMC recommended that no treatment be undertaken, that the condition usually disappears on its own.

2. *The Need for Two Full Time Physicians or in the Alternative, a Continuation of the Correctional Medical Services Program*

The Correctional Medical Services Program is currently scheduled to continue through July 1, 1980. Warden Wyrick testified that if two additional physicians can be hired, then the program will not be renewed. Otherwise, he stated the program will be continued. He felt that two full time doctors, a continuation of the Correctional Medical Services Program, and use of the consultant physicians would be the best arrangement. The warden stated that he is actively seeking a second physician for employment. He further stated that he has been very impressed with the quality of the physicians from the Correctional Medical Services Program.

Dr. Bower's opinion was that the hospital could function with one doctor and the consultants, but that two physicians would make things more comfortable. Dr. Bow-

---

**16.** Mr. Page spent three days in the "hole", or the Adjustment Unit, in December, 1979, after being accused of placing a pencil in his penis and masturbating thereby causing the bleeding. Dr. Bowers testified that the custody official who placed Mr. Page in the hole had "misunderstood" his comments regarding Mr. Page's condition. Although, Dr. Bowers did admit that he had suspected Mr. Page of this behavior at that time. Dr. Sauer testified that there was no indication of such self abuse from Mr. Page's medical records. Further, he did not think that a pencil could be used to cause such injury.

er's testimony did reflect an enormity of tasks that he must perform without assistance. He testified that prison officials had been actively seeking an applicant to fill the vacant post of Assistant Chief Medical Officer.

Dr. Starrett expressed the opinion that at least two full time physicians are necessary at a prison the size of Missouri State Penitentiary.

### 3. The Need for Registered Nurse Coverage 24 Hours a Day on the Second Floor

At present Ms. Ernst staffs the second floor during the second shift at MSPH which runs from 8:00 a. m. to 3:30 p. m. During the first shift which runs from 11:45 p. m. to 8:00 a. m. and the third shift which runs from 3:30 p. m. to 11:45 p. m., no registered nurses are on duty. During the first shift, just one medical assistant is assigned, and during the third shift, two medical assistants are posted.

Plaintiffs contend that a registered nurse is needed to staff the second floor 24 hours a day. Plaintiffs argue that the one or two medical assistants are not sufficient to adequately cover the hospital should an emergency arise.

The testimony indicated very little demonstrating the need for a registered nurse as opposed to a medical assistant to be on duty 24 hours a day. In the opinion of Dr. Starrett, any medical facility that cares for heart patients or performs major surgery should have a doctor or physician's assistant round the clock. Dr. Ciccone testified that at the Springfield facility there were no doctors on duty 24 hours a day, but they were always available by telephone. He did not indicate what the nurse scheduling policies were at that facility. Mr. Ambler testified that with regard to doctors, they are always on call via telephone. Ms. Ernst testified that there had been two other registered nurses working at MSPH, but they were no longer there. She did not testify

regarding their work schedules. Ms. Ernst admitted that it would be desirable to have more registered nurses at MSPH.

### 4. The Need for a Registered Nurse or Medical Assistant to Staff the Intensive Care Unit 24 Hours a Day.

The ICU is now staffed by inmate nurses who basically just observe the progress that the patients are making. Ms. Ernst testified that such coverage is 24 hours a day and is supplemented by medical assistant, nurse and physician visits. Plaintiffs allege that the inmate nurses' unfamiliarity with advanced life support techniques could jeopardize these patients in an emergency. As indicated above, there is always a medical assistant on duty in the hospital and the doctor is always on call.

### 5. The Need for a Licensed Physical Therapist

The physical therapy department is currently staffed by an inmate named "Jones". Mr. Jones is supervised by the medical assistants and by Dr. Bowers. Dr. Bowers indicated that Mr. Jones has had some rehabilitative training. Mr. Fosler testified that the only training that Mr. Jones has received has been from the medical staff at MSPH. Prior to Mr. Jones' tenure, the department was staffed by another inmate—a Mr. Bill Roy Douglas. Dr. Bowers testified that he was unaware of Mr. Douglas' background. The primary function that Mr. Douglas performed was providing whirlpool baths and moist heat treatments.[17]

### Mr. Clarence Hunter

Mr. Hunter has been at the penitentiary for four years on a conviction for assault. Mr. Hunter is paralyzed from the waist down following an altercation with other inmates at the penitentiary during which his spinal cord was severed with a screwdriver. Emergency surgery was performed at UMMC and he was given physical therapy

---

17. There was no challenge by plaintiffs to the sufficiency of the equipment in the physical therapy department and the evidence presented

indicated that many improvements had been made. See, test. of Warden Wyrick.

at the Rusk Rehabilitation Center at UMMC.

At MSPH, Mr. Hunter testified that he has received physical therapy. He stated that the department had been improved during the year prior to trial. He now gets exercise and whirlpool baths three days a week and goes to the exercise yard. He admitted that he had refused to take physical therapy on various occasions.

*Dennis Mercado*

Mr. Mercado is also paralyzed from the waist down. A 1975 gunshot wound caused the injury prior to his admittance at the penitentiary. He is serving a sentence for robbery. Mr. Mercado has been at the penitentiary for approximately three years. During that time, he has been to UMMC 16 times for treatment. He has been prescribed leg braces and can now walk to a limited degree. He testified that he has received physical therapy at MSPH. MSPH also supplies him with wheelchairs.

### C. *PHYSICAL PLANT AND HOSPITAL PROCEDURES*

Plaintiffs have attacked numerous hospital procedures and have alleged that certain physical capabilities of the hospital plant are deficient.

#### 1. *Life Saving Equipment in ICU*

The ICU is on the second floor of the hospital. The "crash cart" which contains such crucial life saving equipment as a defibrillator, a heart monitor, and suction equipment is kept in the surgery area on the first floor. There was unanimity among plaintiffs' experts that keeping such equipment in the surgery area posed a risk to patients in the ICU. See, test. of Drs. Gardiner & Starrett.

Dr. Bowers testified that the crash cart can be moved from the surgery area to the second floor in less than two minutes. He testified that the cart can not be kept on the second floor because of vandalism and theft problems. Mr. Ambler testified that no drills had ever been performed to see how long it would take to move the equip-

ment. Dr. Bowers felt that the arrangement did not pose a risk to patients because there is always an inmate nurse in the ICU and a civilian on the second floor who would notify the appropriate medical personnel. Nevertheless, Dr. Bowers did recognize some problems with the current arrangement. For instance, the doors between the first and second floors are locked many times and two persons are required to move the equipment. There is an intercom between the two floors, but no "panic button" for an alarm to signal an emergency in the ICU.

Ms. Ernst testified that the last hospital she had worked at had a similar arrangement and it took an equivalent amount of time to move the equipment.

#### 2. *The Need for Call Buttons*

The hospital does not possess an electronic signalling system for patients to summon assistance as is commonly found in civilian hospital rooms. The plaintiffs argue that nonambulatory patients could be threatened by the lack of such a system. Dr. Gardiner voiced concern over the potential for tragedy should a sick patient be unable to call for help. This could especially be a problem given that some of the doors to the rooms are locked at night. Dr. Gardiner knew of some prison hospitals that used call systems.

Ms. Ernst testified that hotel-type desk bells are utilized when required.

Dr. Ciccone stated that there were call buttons on one floor of the Springfield facility, but that they were not particularly desirable because the patients regularly broke them. It was his understanding that the hospitals at the federal penitentiaries at Leavenworth, Kansas, and Atlanta, Georgia, did not have such devices.

#### 3. *Sick Call Procedures*

Prior to the advent of the Correctional Medical Services Program at the end of January, 1980, sick call was conducted from 8:00 a. m. to 11:00 a. m. If an inmate wanted to go to sick call, he would sign up the night before or make arrangements to go in the morning. During this morning

sick call, Dr. Bowers testified that anywhere from 100 to 125 inmates would report each day.[18] Since the new program has gone into effect, the hours during which sick call is conducted have been changed to the evenings. This change has caused a reduction in the number of inmates appearing. Now, 50 to 60 inmates are reporting for sick call. Both Dr. Bowers and Warden Wyrick stated that the decline in numbers of inmates reporting for sick call is attributable to the fact that the new hours conflict with the inmates' recreational periods.

Dr. Bowers testified that in 1978, over 46,700 inmates appeared at sick call. In 1979, over 40,800 appeared. Dr. Bowers is of the opinion that ⅓ to ½ of all inmates reporting to sick call are malingerers. He has also observed that 50% of the reporting inmates are seeking over-the-counter type drugs. Dr. Bowers indicated that it is a difficult task to separate legitimate complaints from the frivolous ones.

Sick call is conducted by the medical assistants. They are responsible for screening the complaints.[19] If a complaint appears to have merit requiring a doctor's attention, then the inmate is put on physician's sick call to see a doctor. According to Dr. Bowers and Mr. Fosler, if any inmate demands to see a physician, his request will be honored.[20]

Plaintiffs have challenged this screening process alleging that the medical assistants are unqualified to do diagnosis thereby necessitating the writing of "protocols" for common ailments for use by the medical assistants during sick call and the use of a registered nurse to supervise the medical assistants during sick call. The qualifications of the medical assistants have been fully explored above, but there was evidence on the question of the use of paraprofessionals to screen inmates' medical complaints.

Dr. Starrett testified that the use of paraprofessionals was a good concept. She testified that such personnel were used at Riker's Island for this purpose. However, she stressed the need for close supervision. She further stated that there was a need for protocols or flow sheets that the medical assistants could use to quickly assess symptoms. Dr. Starrett observed such materials in the surgery department, but did not see them at sick call.

Dr. Ciccone also testified that paraprofessionals were used at the Springfield facility to conduct sick call. He concluded that the use of medical assistants at MSPH was appropriate as long as proper supervision was supplied.

Dr. Bowers' testimony indicated that there are standing orders which serve as protocols at sick call. Also, the medical assistants use the Physician's Desk Reference Book and the Merck Manual to assess physical symptoms. Further, he indicated that sick call did not require a high degree of medical awareness. He felt that the medical assistants were adequately supervised.

Sick call is apparently conducted in a large room which contains a number of desks that the medical assistants sit behind during the interviews. Inmates must stand in front of the desks and relate their complaints. Plaintiffs assert that such practices do not afford adequate privacy.

18. Dr. Bowers testified that the prison population is approximately 2300. Dr. Ciccone testified that the average percentage of an inmate population appearing at sick call at the facilities he was familiar with was 10–12%.

19. The medical assistants are also responsible for keeping the out-patient cards which are filled out at the sick call interview. As these cards are a part of each patient's medical record, they are included in this Court's analysis of the medical records in general.

20. Mr. Carl Paxton, incarcerated on a first degree murder conviction, testified that he appeared at sick call "two or three" times in early September, 1979, complaining about his chest and asked to see a doctor. He testified that the medical assistants only gave him cold tablets. Mr. Paxton was admitted to MSPH on September 12, 1979, and numerous tests were performed that indicated an inflammation on his lung. After a hospital rest, more recent tests show slight scarring of no clinical significance. He has been treated by both Dr. Bowers and Dr. Alan Braun. See, test. of Dr. Bowers.

*Mr. Richard Richards*

Mr. Richards is incarcerated on a conviction for murder of a police officer. He works as an industrial welder in the prison industries.

He testified that he has a heart condition and that he had been to sick call many times to no avail. Following an on the job injury, Mr. Richards was diagnosed as having some blockage in his heart arteries. He was told to stay away from fatty foods and he was given special eating privileges. In general, Mr. Richards complained of the attitude of the medical assistants at sick call. He stated that the medical assistants manifest a suspicious attitude regarding medical complaints and that the medical assistants "treat you like an animal." He testified that the physical arrangement of the room resulted in having conversations between inmates and medical assistants overheard by other medical assistants and inmates. Mr. Richards was unhappy that no chairs were provided for inmates.

Dr. Bowers' testimony revealed that the hospital staff rejected the idea of using chairs given the serious problem of malingerers.

### 4. *Psychiatric Ward Procedures*

Plaintiffs contend that no inmate should be confined on the fifth floor without written or verbal authorization by a physician.

Dr. Gardiner's testimony was that the current policy of permitting admissions to the fifth floor psychiatric ward on the basis of an order from either a physician or the staff psychologist was deficient. Dr. Gardiner's opinion was that master's level psychologists are unqualified to make admitting decisions. There is a need, according to Dr. Gardiner, for a complete mental and physical examination. Psychologists are not sufficiently trained to recognize the organic origins of many problems.

*Mr. James Gross*

Mr. Gross possesses a master's degree in psychology from Washington University in St. Louis, Missouri. He has completed approximately 50 hours of graduate work towards his doctorate. He is licensed by the state of Missouri as a clinical psychologist. Mr. Gross testified that his job is to psychologically screen inmates to develop diagnoses. He indicated the largest problem areas he confronts are depression, loneliness and marked anxiety.

Mr. Gross testified that he consults regularly with the Chief Medical Officer on his cases. He stated that he sees patients soon after their admission to the fifth floor. His testimony further showed that physicians do the screening for any organic irregularities and prescribe all drugs. Patients are on the fifth floor for a very short term. Mr. Gross stated that the patients with serious mental problems are transferred within four to five days to the Fulton State Mental Hospital. He testified that the average number of inmates on the fifth floor at any given time is two or three.

*Mr. Gary White*

Mr. White has been incarcerated at MSPH since March 20, 1975, on a conviction for armed robbery. He claimed that he was placed on the fifth floor on May 10, 1978, by inmate nurses and guards for no reason. He further claimed that he was kept there for 13 hours and then released. He contended that this incident has caused him difficulties in the prison population because other inmates feel that he is "crazy." [21]

Plaintiffs also seek that the use of physical restraints on the fifth floor be prohibited except under the direct orders of a physician and that such order be reviewed every 12 hours.

Mr. Gross testified that usually only a doctor can order restraints, but in an emergency custody officers can order them. In response to a hypothetical situation of an inmate being placed in restraints on a Friday night, Mr. Gross stated that the doctor would be called at home immediately. He further testified that the longest he could recall anyone having been restrained was

---

**21.** Mr. White filed an independent damage claim for $1.3 million following this incident. See, *White v. Wyrick, et al.*, No. 79–4134–CV–C (W.D.Mo. filed June 20, 1979).

three days. Apparently, only the warden or the doctor can order the release of an individual from restraints. On direct examination, Mr. Gross indicated that in a case of a suicidal patient, the individual is placed naked under a blanket in restraints and watched very closely. He said that such occurrences are extremely rare. There have been no successful suicides on the fifth floor since Mr. Gross began his employment at MSPH.

Dr. Gardiner reviewed the standing orders from the warden that are posted on the fifth floor. He disagreed with the policy of allowing restraints to be ordered by the Chief Medical Officer, the staff psychologist or a duty captain [a supervisory custody officer]. On cross-examination, he noted that restraints were commonly used in his Philadelphia practice and that only a very small percentage of mental hospitals did not use restraints. Generally, Dr. Gardiner's opinion was that restraints should be utilized only upon a physician's order and under extreme circumstances.

*Mr. Fred Pridgett*

Mr. Pridgett has been at Missouri State Penitentiary for 10 years on a second degree murder conviction. He stated that he had been to the fifth floor many times and had been to the Fulton Hospital three times. He complained that he had been placed in restraints for 14 days some two years ago. He stated that he was naked and he was not allowed to get up to use the bathroom or to eat. He further complained that the guards once let inmates in to beat on him.

Dr. Bowers testified that Mr. Pridgett was diagnosed at the Fulton Hospital as a schizophrenic. Mr. Pridgett would "act out" in bizarre fashion. Dr. Bowers admitted that Mr. Pridgett had been placed in restraints for short periods of time. Apparently, the various drugs being used to treat Mr. Pridgett were having no effect. In March, 1979, Dr. Bowers treated Mr. Pridgett with a new drug called prolixin. Mr.

Pridgett has taken this drug since March, 1979, and his condition has remarkably improved. He has had no violation reports written and is of no particular concern to prison authorities. Mr. Pridgett agreed on cross-examination that since March, 1979, he has had no more episodes and has been stable. He also has become president of a prisoners' club.

5. *The Need for an Assessment of the Relationship Between Prisoners With a Chronic Health Condition and Their Work and Living Arrangements*

The plaintiffs submit that defendants have not properly accommodated prisoners who live with chronic health conditions. Plaintiffs are seeking an order of this Court to mandate a prison-wide assessment of the medical condition of the inmates with chronic health conditions for a comparison with their present work assignments and living arrangements.

*Mr. Ricky Vaughan*

Mr. Vaughan is 25 years old. He is serving a sentence on a conviction for second degree murder.

Mr. Vaughan is afflicted with a common heart condition known as paroxysmal atrial tachycardia ("PAT"). Apparently, the condition causes some pain and attacks from time to time. The PAT condition was confirmed by Dr. Bowers after having run a number of EKG tests. Mr. Vaughan testified that he has had the condition since childhood and that on the street he used to take valium and digitalis for it. He stated that he has not been receiving these drugs at MSPH. He admitted on cross-examination, though, that he has not asked for valium.[22] He further testified that he had been assigned to work on a garbage truck detail—a job requiring heavy lifting. Now, he is a student at the prison and attends classes most of the day.

---

22. Mr. Vaughan has filed an independent lawsuit complaining of inadequate medical care and he is seeking $10,000 in damages. See,

*Vaughan v. Wyrick, et al.*, No. 79–4229–CV–C (W.D.Mo. filed Nov. 9, 1979).

*Dr. David Mehr*

Dr. Mehr is a medical doctor from Columbia, Missouri, with a specialty in family practice. He is an Assistant Professor of Medicine at UMMC.

Dr. Mehr examined Mr. Vaughan on February 9, 1980, at MSPH's surgery department. He described the examination as "quite unremarkable". Dr. Mehr learned from Mr. Vaughan's medical history of an EKG performed on May 18, 1978, that showed PAT. Dr. Mehr testified that an individual with this condition should never work at any job that would not allow him to sit down immediately. Dr. Mehr recognized that Mr. Vaughan's reassignment to the prison school is consistent with the kind of environment that someone with PAT requires. Under examination by the Court, Dr. Mehr concluded that MSPH's failure to immediately treat Mr. Vaughan could possibly constitute negligence or malpractice.

Mr. Richards also testified about MSPH's failure to properly assess his health condition vis-a-vis his work and living arrangements. Mr. Richards stated that his heart condition causes him pain when he climbs stairs and that he must climb 60 steps to reach his cell. He further indicated that his job requires a great deal of heavy lifting. Mr. Richards has been given the privilege to sit down if he is not feeling well and it was disclosed on cross-examination that he has never asked the warden for a change of cells.

*Mr. Larry Callahan*

Mr. Callahan has been incarcerated at the Missouri State Penitentiary since 1976 on a conviction for theft and flourishing a firearm.

He testified that he sustained a back injury while working on a tow boat prior to his admittance to the penitentiary. He complained of an indifference on the part of the hospital staff to his condition; but his own testimony reveals he received numerous examinations and tests, and he made over six trips to UMMC and ultimately received an operation there to repair his herniated disc.

The more probative aspect of his testimony involved his claims that prior to his operation, he was in constant pain and that he had been assigned to the labor crew in the maintenance department. He testified that this job required him to shovel snow and to pick up trash. Further, he stated that prior to this assignment, he had been in the plumbing department. This assignment involved carrying toilet stools and pipe wrenches. Mr. Callahan testified that, in general, his work assignments did not cause him any pain as he was constantly in pain. During cross-examination, Mr. Callahan agreed that in November, 1978, an order was entered by Dr. Key that he should not lift over 25 pounds and that his job assignment currently is to operate a motorized meat grinder in the food service area.

On the question of the proper relationship between the health of the inmates and their living and work assignments, Dr. Bowers testified that when inmates are admitted to the penitentiary, they are examined on the first Wednesday after they arrive. If someone has a serious medical problem, that person is immediately referred to Dr. Bowers for treatment. He further stated that if an inmate has a problem that will interfere with an ability to work, he designates a duty status that indicates the type of work suitable for an inmate with a special condition.

6. *The Appropriateness of Major Surgery at MSPH*

Plaintiffs allege that no non-emergency surgery involving blood transfusions or general or spinal anesthesia should be performed at MSPH.[23]

Among plaintiffs' expert witnesses, only Dr. Starrett recommended that major sur-

**23.** In their Post-Trial Submission, plaintiffs' counsel advanced the rationale that such surgery poses a danger because of the alleged insufficiency of staff and equipment in the ICU. Insofar as the adequacy of staff and equipment in the ICU are treated elsewhere in this opinion, this portion of the findings will deal solely with the issue of the propriety of performing major non-emergency surgery in MSPH's surgery department.

gery be referred elsewhere. Dr. Karsh testified that the surgery department looked adequate. Dr. Sauer agreed that the equipment in the surgery department appeared to be adequate to do most types of operations, but he expressed a reservation about performing colon cancer surgery because of the medical records situation and the capabilities in the areas of anesthesiology and cardiology.

*Mr. Van Johnson*

Mr. Johnson is a 22 year old inmate who was admitted to the penitentiary in July, 1979, on a conviction for robbery. He has also served a prior term from November, 1975, through January 1, 1979, for robbery as well.

In 1975, Mr. Johnson was stabbed in his left arm during an altercation with other inmates. He was given immediate medical attention. Dr. Bowers indicated that some therapy was necessary after the wound had healed. Presently, Mr. Johnson has been referred to a Dr. Heimburger, a noted plastic surgeon. Apparently, Dr. Heimburger is willing to perform reconstructive surgery on Mr. Johnson's arm at MSPH, but Mr. Johnson has refused to be operated on at MSPH because of his fear that there is insufficient support staff to assist Dr. Heimburger.[24]

Dr. Bowers listed the recent surgical statistics kept at MSPH as follows:

| | 1978 | 1979 |
|---|---|---|
| Minor Procedures | 380 | 545 |
| Miscellaneous Procedures (includes dressing changes) | 3400 | 5000 |
| Surgical Consultations | 523 | 488 |
| Major Surgical Procedures | 84 | 88 |
| Minor Surgical Procedures | Low 80's | 97 |
| Castings | 130 | 96 |
| X-Rays | 4800 | 4200 |

Dr. Bowers further testified that he has every confidence in the capabilities of the surgery department and the individuals who staff it.

*Dr. Alan Doerhoff*

Dr. Doerhoff is a medical doctor and a surgeon. He staffs seven hospitals in the Jefferson City, Missouri, area. Since July, 1974, he has performed surgery at MSPH. He stated that he performs 75 to 100 major surgeries a year at MSPH. Dr. Doerhoff is most impressed with the quality of the staff and equipment in the surgery department.[25] He feels that the quality of surgical care is the same as is available privately. Dr. Doerhoff testified that he has found few examples of post-surgery infection.

Ms. Ernst testified that during her 10 year tenure at MSPH, she knew of no death resulting from a surgery complication. Further, she indicated that she did not recall any post-operative infections or cross-infections.

## CONCLUSIONS OF LAW

As indicated at the start of this Opinion, plaintiffs are seeking relief in at least 21 specific areas at MSPH. In determining the sufficiency of proof in this case regarding these various claims, this Court is mindful of the defendants' recognition of the deficiencies in the delivery of health care services at MSPH. *See,* Division of Corrections, Department of Social Services, *Budget Requests for Fiscal Years,* 1977–80, plaintiffs' Exhibits Nos. M–4, M–3, M–2, M–1, testimony of St. Louis Post-Dispatch reporter George Curry, and the hospital staff meeting minutes, plaintiffs' Exhibits Nos.

---

**24.** This Court took judicial notice, at trial, of the fact that this claim of Mr. Johnson's had been dismissed in an independent pro se complaint filed by Mr. Johnson. See, Report and Recommendation of the United States Magistrate that the Cause be Dismissed as "Frivolous" Under the Provisions of 28 U.S.C. § 1915(d), filed February 6, 1980, and the Supplemental Report and Recommendation of the United States Magistrate that the Cause Be Dismissed as "Frivolous" under 28 U.S.C. § 1915(d), filed March 5, 1980, and the Order of

this Court adopting such reports, *Johnson v. Wyrick,* No. 79–4234–CV–C (W.D.Mo. March 5, 1980).

**25.** Although more relevant to the medical records issue, Dr. Doerhoff testified that in his opinion, most record keeping is unnecessary as it is carried out in private hospitals. Dr. Doerhoff indicated he appreciates the less structured atmosphere at MSPH. He stated that he sees his patients regularly but does not record his visits.

A–1 through A–39.[26] Nonetheless, the only question properly before this Court is the constitutionality of the medical treatment at MSPH.[27]

*Standards of Review*

■ Initially, it must be observed that in class actions challenging systemic deficiencies in the delivery of medical services in prisons, it has been held that in order to show "deliberate indifference" on an institutional basis, plaintiffs must demonstrate either "[a] series of incidents closely related in time . . . [which] . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners" *or* that "the medical facilities were so wholly inadequate for the prison population's needs that suffering would be inevitable." *Bishop v. Stoneman*, 508 F.2d 1224, 1226 (2nd Cir. 1974); *see also, Todaro v. Ward, supra*, 565 F.2d at 52; *Palmigiano v. Garrahy*, 443 F.Supp. 956, 983–84 (D.R.I. 1977), *remanded for further consideration,* 599 F.2d 17 (1st Cir. 1979); *Laaman v. Helgemoe*, 437 F.Supp. 269, 314 (D.N.H. 1977); *Battle v. Anderson*, 376 F.Supp. 402, 424 (E.D.Okl.1974); and Note, 13 Suffolk L.Rev. 603, 610–11 (1979). The implication of this formulation for the application of the deliberate indifference test on an institutional basis is that courts will not hesitate to act when presented with a substantial risk to the health and physical well being of a prison population. *See Todaro v. Ward, supra*, 565 F.2d at 52; *Newman v. Alabama*, 503 F.2d 1320, 1323 n. 4 (5th Cir. 1974); *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Finney v. Arkansas Board of Corrections*, 505 F.2d 194, 202–04 (8th Cir. 1974); *Campbell v. Beto*, 460 F.2d 765, 768 (5th Cir. 1972); *Laaman v. Helgemoe, supra*, 437 F.Supp. at 312 and *Palmigiano v. Garrahy, supra*, 443 F.Supp. at 984. Thus, this Court will interpret the evidence on each of the challenged areas at MSPH in light of these well established standards of review.

*The Question of a Sufficiently Qualified Paraprofessional and Inmate Staff*

■ This Court finds that the background qualifications, experience and ongoing training of the medical assistants and the inmate personnel are not constitutionally deficient. Plaintiffs have failed to show this Court the necessity for an order requiring an evaluative review of the qualifications of the paraprofessional personnel at MSPH with a corresponding order that further training be secured as necessary. While the record indicates that there are varying levels of qualifications within the staff, taken as a whole, this Court is unable to conclude that there is a systemic deficiency posing a risk of the magnitude necessary to demonstrate a deliberate indifference to the serious medical needs of the prison population.

The defendants should be keenly aware that the question of unqualified staff and the results flowing therefrom have been held to be within the purview of judicial review. See, *Laaman v. Helgemoe, supra*, 437 F.Supp. at 312; and *Palmigiano v. Garrahy, supra*, 443 F.Supp. at 974. The finding here should not be interpreted by defendants as this Court's complete approval of the qualifications of the paraprofessional staff. In some individual cases, it appears

---

**26.** This Court acknowledges such evidence but finds it to be of limited probative value given the context in which the statements were made—budget requests before the state legislature, a press interview with the warden, and isolated comments made during internal staff meetings as recorded in rather cryptic minutes.

**27.** While the review of conditions at MSPH is limited to constitutional violations, this Court is hopeful that the legislative response to the conditions of the health care delivery system at MSPH will be to surpass the bare constitutional thresholds. Modern concepts of penology can not be overlooked in any debate on the necessary components in so basic a service as health care. As the Eighth Circuit has firmly noted, "[I]f the State of Missouri is going to continue to operate the Penitentiary at Jefferson City, that institution is going to have to be brought up to constitutional standards. That fact must be recognized not only by the executive branch of the government of the State of Missouri but by the legislative branch as well. The Penitentiary has been neglected far too long." *Burks v. Teasdale, supra*, 603 F.2d at 62.

that higher qualifications would be desirable. Further, the Chief Medical Officer should take a much stronger hand in requiring and supervising the continuing education of the paraprofessional staff. The training course for the inmate nurses appears to be adequate for their orderly type functions; but, they should be closely supervised.

*The Question of Adequate and Available Medical Records*

■ The medical records at MSPH are constitutionally infirm. The evidence is replete with examples of inadequate, inaccurate and unprofessionally maintained medical records. This Court rejects defendants' contention that there is an insignificant relationship between proper medical records and adequate medical care. While such a position may be arguable in the abstract, plaintiffs' experts clearly demonstrated the critical importance of adequate and accurate medical records in any attempt to provide a continuity of medical care. Especially now, given the advent of the Correctional Medical Services Program with its rotation of physicians through the hospital, the possibility for disaster stemming from a failure to properly chart is greatly increased. The failure over at least the past five years of prison authorities to remedy this situation demonstrates a sufficient deliberate indifference given the substantial risk that the deficiencies in the records pose to the inmates. *See, Finney v. Arkansas Board of Corrections, supra,* 505 F.2d at 203; *Newman v. Alabama,* 503 F.2d at 1323 n. 4; *Todaro v. Ward,* 431 F.Supp. 1129, 1143–46 (S.D.N.Y.) *aff'd.* 565 F.2d 48 (2nd Cir. 1977); and *Laaman v. Helgemoe, supra,* 437 F.Supp. at 324. The maintenance of proper medical records will serve a parallel objective of providing accurate documentation of the care received by inmates thereby insuring objective bases for review and evaluation of the level of the quality and results of the treatment provided.

Plaintiff's experts identified various acceptable techniques for record keeping. This Court will not attempt to isolate the technique that should be implemented at MSPH. It is sufficient to hold that the present system of record keeping is so deficient that it results in a very grave risk of unnecessary pain and suffering. Any acceptable remedy of this condition will require an analysis of all the factors relating to medical record production and maintenance—including staff training and evaluative review of staff performance. Further, the evidence clearly indicates that the decentralized method of record keeping currently used operates to deprive the attending physician of complete medical histories. Too many times, plaintiffs' experts were unable to offer complete testimony on a given patient because it would be discovered that different segments of the patient's medical record were kept in different places. In some reasonable fashion, the confusing and erratic system of dispersed records must be organized in a coherent and logical manner so as to make the medical records readily available to those who need them to evaluate and treat the patient.

*The Question of Nonphysician Surgery*

■ The performance of surgery by nonphysicians during nonemergency situations shocks the conscience of this Court. The official sanctioning of such practices constitutes a constitutional violation of a most severe order. Even though the record in this case indicates that such practices apparently were halted in 1978, this Court holds that such activities exhibit a gross deliberate indifference to the serious medical needs of the inmates requiring surgical services at MSPH. It is most disturbing to this Court that prison officials would authorize surgery to be performed by nonphysicians. The inherent potential for unnecessary tragedy is too readily apparent to merit discussion. Such conditions can not be tolerated. As the Supreme Court noted in *Estelle v. Gamble, supra,* ". . . unnecessary suffering is inconsistent with contemporary standards of decency." *Id.* 429 U.S. at 103, 97 S.Ct. at 290.

*The Question of Current Transfer Practices*

■ The practices currently in use to transfer inmates to referral institutions are

constitutionally defective in two respects. First, insofar as inmates have been returned to MSPH against physician advice, the inmates have been subjected to unnecessary pain and suffering clearly exhibiting a deliberate indifference to their serious medical needs. The case of Mr. Helming rather dramatically illustrates the indifference shown to some inmates. He was returned to MSPH even though his physician argued that such a move was medically unwise. While defendants rely upon the 30 day per year medical furlough limitations contained within § 216.224, RSMo as justifying their transfer practices, this Court can not blind itself to unnecessary suffering because of an inflexible state statute that fails to grant the necessary and proper discretion to prison officials. In view of the record, this Court concludes that it is unconstitutional to return an inmate to MSPH from a referral institution when in the exercise of sound medical judgment such a transfer would have a substantial deleterious effect on the patient's medical condition.[28] *See generally, Martinez v. Mancusi,* 443 F.2d 921 (2nd Cir. 1970).

■ Second, inmates have experienced unreasonable and medically unsound delays prior to transfer to the referral institutions. As a consequence, substantial damage to the inmates' health has occurred in certain instances. The consequence of such delays has been a violation of the Eighth Amendment's mandate against deliberate indifference to serious medical needs. While this Court commends MSPH's general policy of transferring any inmate who is designated by a physician for referral for specialized treatment, the record indicates that some inmates have experienced inordinate delays because of administrative problems relating to obtaining adequate custody personnel to accompany them during the transfer. Administrative problems of the nature involved here can not serve as a defense to what is otherwise a deliberate indifference to serious medical needs. *See, Finney v. Arkansas Board of Corrections, supra,* 505

F.2d at 202. This Court holds that the failure to transfer, within a period of time that is not medically unsound, inmate patients who have been referred (or scheduled to return) by a physician to an outside institution for specialized treatment constitutes a deliberate indifference to serious medical needs.

*The Question of Adequate Physician Staffing*

■ This Court finds no constitutional deficiencies in the level of physician staffing at MSPH. Warden Wyrick testified that an active search is under way to locate a second physician and that the Correctional Medical Services Program will be continued unless he can hire a *third* physician. As well, MSPH draws from a substantial number of consultant physicians. Indeed, plaintiffs are only seeking a continuation of the Correctional Medical Services Program until a *second* physician is hired. As such, plaintiffs' request has been satisfied.

*The Question of Adequate Nursing Services and Physical Therapy*

■ The record does not support plaintiffs' contention that it is a constitutional violation for defendants to fail to provide for registered nurse coverage 24 hours a day on the second floor. Ms. Ernst staffs the floor during the second shift and medical assistants staff the floor during the first and third shifts. There is no break in coverage by civilian medical personnel. *See, Laaman v. Helgemoe, supra,* 437 F.Supp. at 312–13. Further, there was credible evidence that in any emergency there is always a doctor on call.

■ Similarly, plaintiffs have not demonstrated a constitutional mandate that a registered nurse or medical assistant rather than inmate nurses be stationed in the ICU to monitor patients. The evidence showed that if an emergency erupts, competent medical personnel are immediately available.

---

**28.** It is unfortunate that this holding may require the posting of a guard in certain cases when it might be unnecessary from a security standpoint.

Plaintiffs have failed to carry their burden of proof that MSPH's lack of a licensed physical therapist results in the infringement of any constitutional rights of the inmates. The testimony reveals that some therapy is provided at MSPH and it is supplemented at referral institutions. The Court is persuaded that a physical therapist would be a highly beneficial addition to the staff at MSPH; but without more, this Court must and does hold that the plaintiffs have fallen far short of establishing a constitutional deficiency.

### The Question of the Availability of Adequate Life Saving Equipment

The lack of life saving equipment on the second floor in the ICU presents a close question; even so, this Court is convinced and finds that defendants' failure to have the necessary emergency equipment located on the second floor in or near the ICU results in a deliberate indifference to the serious medical needs of patients in the ICU. See, Palmigiano v. Garrahy, supra, 443 F.Supp. at 974; and Laaman v. Helgemoe, supra, 437 F.Supp. at 314. The present location of the "crash cart" in the surgery area on the first floor together with the problems involved in moving it to the second floor to the patients in the shortest practicable time poses a significant risk of the infliction of unnecessary suffering to warrant this finding.[29] Defendants claim that the cart can be moved from the surgery area on the first floor to the ICU on the second in a matter of two minutes or less. While this is probably true under ideal conditions, there is enough in the evidence to suggest that serious delays could result. A patient experiencing a heart attack or similar malady needs access to such equipment in seconds. Any unnecessary delay could bring about an avoidable tragedy. Dr. Bowers testified that such equipment cannot be kept on the second floor in or near the ICU because of vandalism and theft problems. This rationale is without merit in view of the testimony that the ICU is staffed 24 hours a day. The vandalism problem is reasonably manageable and cannot serve to justify not keeping the vital equipment on the second floor near or in the ICU.

### The Question of Call Buttons

While some courts have recognized the constitutional necessity of providing for patient use electronic signalling devices, see, Lightfoot v. Walker, 486 F.Supp. 504, p. 527 (S.D.Ill.1980); Todaro v. Ward, supra, 431 F.Supp. at 1139–41; Laaman v. Helgemoe, supra, 437 F.Supp. at 324, this Court does not find that the problem of not having them at MSPH is so severe as to warrant a finding that the lack of such a system presents an unconstitutional condition. There was no showing of a serious medical risk engendered by proceeding with desk bells. Available personnel as well as other means for a patient to obtain the needed attention of hospital staff was described in the evidence. Therefore, this Court is not convinced that the present signalling system is constitutionally inadequate because it does not include a push button call system.

### The Question of Sick Call Procedures

The screening process during sick call could no doubt be improved by standardized protocols and registered nurse supervision, but the current practices do not rise to the level of a constitutional violation. Without question, on occasion this record contains described incidents of inmates complaining that the medical assistants failed to perceive the subtleties of their particular symptoms. But, on the whole, the record does not support a finding that these few incidents reflect a pattern of deliberate indifference. The Court is persuaded that the screening process, while imperfect, does not violate the plaintiffs' constitutional rights. Indeed, the expert

29. The adequacy of defendant's equipment was not challenged. The location of that equipment is the thrust of the challenge.

witnesses of the plaintiffs as well as those of the defendants strongly endorsed the use of paraprofessional screening as long as adequate supervision is supplied.[30]

Plaintiffs also attack the lack of privacy during sick call. They seek an order requiring more privacy and also requiring chairs so that they can sit while talking to the medical assistants about medical problems. Again, while provisions for more privacy and also provision of chairs for their comfort would appear to be a more courteous and compassionate practice, this Court is not persuaded that any violation of any of plaintiffs' constitutional rights has resulted.

### The Question of the Policies and Practices in the Psychiatric Unit

The practices and policies concerning the fifth floor psychiatric unit were challenged on two grounds. First, plaintiffs contended that only a physician should be able to order confinement on the fifth floor; and second, plaintiffs argued that only a physician should be able to order the use of restraints and that such an order must be reviewed every 12 hours.

The evidence showed that admission to the fifth floor can be ordered by a physician or the staff psychologist. Restraints can be ordered by a physician, the psychologist or custody personnel.[31] Apparently, these are the only governing policies concerning admission procedures on the fifth floor. Insofar as the use of seclusion and/or restraints for mentally disturbed inmates can only be used for *medical* purposes without running afoul of due process guarantees, this Court holds that custody personnel are unqualified to make such determinations on a non-emergency basis.[32] See, *Eckerhart v. Hensley,* 475 F.Supp. 908 (W.D.Mo.1979); *Negron v. Preiser,* 382 F.Supp. 535 (S.D.N.Y.1974); and *generally, Wolff v. McDonnell, supra,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Further, although Dr. Gardiner testified that masters degree level clinical psychologists are unqualified to make admitting decisions, the evidence shows that Mr. Gross, the psychologist, consults regularly with the Chief Medical Officer and that it is the physicians who screen for organic causes of erratic behavior as well as prescribe all drugs. Thus, there is sufficient interplay between the psychologist and the physicians to avoid a finding of a deliberate indifference to serious medical needs.

The more disturbing aspect of the present record is the reflection of a complete lack of a systematic policy for the use of seclusion and/or restraints. Without some established policy for the use of seclusion and/or restraints, there is a continuing serious risk of constitutional infringements regarding those inmates who may be placed on the fifth floor. This lack of a seclusion and restraint policy constitutes a violation of the inmates' constitutional right to a medical decision to utilize physical restraints or seclusion made in a context designed to protect the inmates from an arbitrary deprivation of personal liberty. See, *Eckerhart v. Hensley, supra,* 475 F.Supp. at

---

**30.** Further, this Court observes that the changed scheduling for sick call has worked a significant reduction in the number of inmates appearing. The wisdom of scheduling sick call at a time other than during duty hours in the prison industries needs no elaboration here. It would appear that only those inmates with genuine medical difficulties are appearing in the early evenings. It seems likely that the lessening of the pressure on the hospital staff will serve to bring about more careful scrutiny of inmate medical complaints. Additionally, there is persuasive evidence that inmates who request to do so may discuss their medical problems directly with a doctor.

**31.** Ordering the use of restraints necessarily implies that the individual be placed on the fifth floor. To this extent, custody personnel are able to make "admitting" decisions.

**32.** In the event of an actual emergency, this Court is convinced that custody personnel should be able to subdue an inmate who might prove harmful to himself or to others and be able to place such an inmate in the psychiatric unit prior to notification of appropriate medical personnel.

926;[33] and *Negron v. Preiser*, supra, 382 F.Supp. at 541–43.

 Plaintiffs argued in their "Post-Trial Submission" that the fifth floor needed a psychiatrist and senior psychiatric aides, yet failed to include a specific demand for the invocation of such mandatory injunctive power in the "relief" section of their submission. Insofar as the plaintiffs have based their challenge on the need for a psychiatrist and better qualified aides, this Court finds no constitutional deficiencies in the use of a masters degree level psychologist who works closely with the Chief Medical Officer and the use of medical assistants with some psychiatric training. This is especially so in a circumstance where the length of stay of an inmate on the fifth floor is for very short durations pending transfer, if necessary, to the Fulton State Mental Hospital. The constitutional standard for adequate psychological or psychiatric care has been said to be that "when inmates with serious mental ills are effectively prevented from being diagnosed and treated by qualified professionals, the system of care does not meet the constitutional requirements set forth by [*Estelle v. Gamble, supra*]." *Inmates of Allegheny City Jail v. Pierce*, 612 F.2d at 763. *See also, Eckerhart v. Hensley*, supra, 475 F.Supp. 908; and, Note, 45 Mo.L.Rev. 357 (1980). The Court finds that MSPH's inmates are not denied access to qualified professionals.

## The Question of Prison Policies Re Inmates with Chronic Health Conditions

Careful consideration has been given to the evidence concerning the work and living arrangements of those inmates with chronic health problems.

 Plaintiffs' request for a special assessment of the inmates with chronic health conditions and their work and living arrangements when viewed in the light of the evidence is not constitutionally mandated. *See, Todaro v. Ward*, supra, 431 F.Supp. at 1153–54. The evidence does not justify a finding that inmates with chronic health problems have experienced a deliberate indifference to their serious medical needs by prison staff. For example, Mr. Vaughan, who has a congenital heart condition, has been reassigned to the prison school which provides an environment that is suitable for an individual with his condition. Mr. Richards, who has a chronic heart problem, has been granted special dining privileges and the privilege to lie down during the day if he feels poorly. Mr. Richards, who lives on an upper level, concedes that he has not asked the warden for a lower level cell assignment, and has not been refused such a change. Mr. Callahan received back surgery at UMMC and was assigned from a strenuous job to a less strenuous job operating a motorized food grinder. Indeed, most of the individual complaints were not that

---

**33.** The record is such that this court does not undertake "to indicate precisely what procedures afford minimal constitutional protections. For a comparison which may be helpful, this Court notes the policies in effect at the Fulton State Mental Hospital.

All seclusion or restraint orders must be signed by a doctor. Seclusion or restraint is to be used to protect the patient and others from his severe emotional outbursts, perhaps involving acts of aggression or of self-abuse. All other means of controlling the patient are to be tried before seclusion is used. A patient may be put in seclusion or restraints in an emergency by psychiatric aides. However, as soon as the emergency is under control, the doctor must be notified. Emergency use of seclusion or restraints may be no longer than twenty minutes. Within that time the doctor must see the patient and order

continuation of the seclusion or restraint, if indicated. Written seclusion and restraint orders are effective for no more than twenty-four hours and must be renewed if seclusion or restraint is to be continued. A patient must be seen by aides every fifteen minutes and his condition charted every hour. Each incident of seclusion or restraint is to be reported in manner to facilitate review of the doctor's decision. The reporting is to include how the seclusion or restraint is to be used, a description of the behavior that required such use, alternatives which were attempted or considered prior to the use of seclusion, and the duration of the order. All such incidents are to be reviewed by the treatment team and a separate review committee. *Eckerhart v. Hensley*, supra, 475 F.Supp. at 927.

defendants had not recognized the complainant's medical problems, but rather, that the defendants did not make the desired changes quickly enough. Dr. Bowers testified that prisoners are examined upon admission to the penitentiary and that he makes note of any chronic problem and the effect it may have on the inmate's work assignments. Viewed in its entirety, the evidence does not show a pattern of deliberate indifference to a serious medical condition so as to justify a finding of a constitutional violation. However, greater care than ordinary should be taken with regard to prisoners who have substantial chronic health conditions of a serious nature. Work and living assignments should be tailored in light of the medical problems so as to be compatible with the inmates' serious medical needs and their physical capabilities. Failure to adjust timely the work and/or living arrangements of an inmate who is chronically ill when prison officials are aware of his chronic condition may constitute a deliberate indifference to the inmate's serious medical needs.

### The Question of the Performance of Major Surgery

 This Court finds no constitutional violation involving performance of major surgery at MSPH. The experts were nearly all in agreement that the facilities at MSPH are perfectly adequate to perform most types of surgery, including the surgery actually performed. To all indications, MSPH has been very successful in both the performance and after care of its inmates operated on within MSPH.

### Other Issues Mentioned

#### Guard Brutality

 There was no showing of a pattern of guard brutality to substantiate plaintiffs' demand for an order to be posted in the hospital to restrain guards from inflicting unnecessary pain on MSPH prisoner patients. The only evidence on this issue was testimony of weak credibility regarding a few isolated incidents. In order to hold, on an institutional basis, that the custody personnel should be restrained from inflicting unnecessary pain, it is necessary to have a clear showing of a pattern of conduct that demonstrates an institutional acquiescence in such egregious conduct.

#### Malingering Reports

 For the same reason, plaintiffs' request for an order that would prohibit defendant employees from writing violation reports for alleged malingering without the written authorization of the Chief Medical Officer is denied. There was no showing that any abusive pattern exists of defendant's employees writing violation reports for malingering. The few, somewhat isolated incidents reflected in this record are not sufficient in substance or in number to rise to a constitutional level and do not warrant the relief plaintiffs are seeking.

#### Inmate Use in Medical Records Department

 This Court finds that while the use of inmates in the medical records department may be in many respects an undesirable practice, the evidence does not support a finding that a deliberate indifference to the serious medical needs of the inmates has resulted thereby. It was the opinion of one of plaintiffs' experts that for confidentiality purposes, inmates should not have access to the medical records. Defendants indicated that they have not experienced any problems with the use of inmates in the medical record department. In the absence of any showing of how the use of inmates for these clerical tasks has adversely affected the prisoner patients, the use of inmates in the medical records department is not proscribed on constitutional grounds.

### CONCLUSION

 Overall, the undersigned Court was favorably impressed with the level and quality of medical services provided to the inmates at MSPH. In certain unchallenged areas, e. g., the laboratory, the x-ray department, the dental department, the optometry department, and the pharmacy, the

services appeared to be of good quality. All of the experts were in agreement that the hospital was in excellent repair and that the entire facility was very clean and sanitary. The evidence also indicated a high level of concern for the inmates' welfare on the part of some MSPH personnel.[34]

■ Nevertheless, as indicated above, this Court is persuaded by the evidence that certain constitutional deficiencies exist which result in a deliberate indifference to the serious medical needs of the inmate patients. Insofar as the inmates must rely on the prison system to attend to their medical needs, the modern conscience cannot tolerate the continued existence of the identified offending conditions that result in violations of the inmates' constitutional rights. *See, Estelle v. Gamble, supra,* 429 U.S. at 103–04, 97 S.Ct. at 290–91. As Mr. Justice Blackmun has recently noted in *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980):

> "It is society's responsibility to protect the life and health of its prisoners. '[W]hen a sheriff or a marshal . . . takes a man from the courthouse in a prison van and transports him to confinement for two or three or ten years, *this is our act. We* have tolled the bell for him. And whether we like it or not, we have made him our collective responsibility. We are free to do something about him; he is not'. (Emphasis supplied in original). Address by THE CHIEF JUSTICE, 25 Record of the Ass'n of the Bar of the City of New York (March 1970 Supp.) 17."

Therefore, a conference of counsel to discuss an appropriate remedy is ordered by this Court. Defendants will bear the responsibility of promptly preparing and circulating to opposing counsel and to the Court a plan to expeditiously rectify those conditions found unconstitutional. No other order will issue at this time. Jurisdiction is retained.

---

**34.** Further, this Court has been favorably impressed with the efforts of Warden Wyrick to achieve a high quality medical service for the inmates. As the Budget Requests for 1977 through 1980 indicate, the warden and officials of the Department of Corrections have time and time again sought greater assistance from the Missouri legislature to improve the level of services at MSPH. As well, the warden has been a tireless champion for improvements at the Penitentiary in general. This Court recognizes and appreciates the energy, vigor and dedication of Warden Wyrick in this respect.